The opinion of the court was delivered by
Manning, C. J.
The parties to this suit are owners of adjoining plantations on the right bank of Bayou Lafourche in the parish of Assumption. The plaintiff’s demand is for eight thousand dollars as compensation for damages caused, as he alleges, by the acts of the defendant which occasioned the destruction of his crops in 1874.
The waters of the Mississippi river rose high in that year. There were several-crevasses, and consequent inundations. These two plantations were endangered by the back water, which from the confirmation of that part of the country, was sure to flow in upon them from the rear, and this necessitated the construction of works for their protection.
*1360 The cause of action partly rests upon an alleged contract between the “owners of the two plantations to keep up a common line of defence against back water, and upon the existence of a ditch, alleged to -be common to both properties, through which some of the crevasse water passed, and in which was a temporary obstruction, placed there by defendant and by him subsequently removed.
Both of these failed to be substantiated on the trial. There was no proof of any contract between the present owners for a common system of defence, and none to establish a pre-existing contract which would amount to, or would entail, a servitude upon the lands. The ditch is there, but so far from being common, it is entirely on the defendant’s land.
The action resolves itself into a claim for damages for loss occasioned by works erected by the defendant upon his own land to protect it from an alarming accession of water, and from what proved to be an extraordinary inundation. It is matter of public history that the overflow of 1874 carried ruin and devastation to an unusually extensive area of country, spreading especially over the alluvial basin between the Atchafalaya and Lafourche, and causing unprecedented destruction in the parish where the properties of these litigants are situated.
The pivotal inquiry then here is, is the defendant liable in damages for injury, caused by works erected on his own land to save it and the crops upon it from destruction, in an exceptional and pressing emergency.
The plan adopted by the defendant for the protection of his property, and the works erected in carrying it out, was intelligent and systematic. It was not hap-hazard. Nothing was done from mere transient impulse, or the suggestion of a moment, but the plan was conceived as a whole, and so perfected and executed. It also appears that defendant was both willing and anxious to have the co-operation of the plaintiff in maturing, adopting, and carrying out some system of defence, common to both, which each would assist in preparing, and which would equally protect both. Turjeon, the overseer at Mailhot’s place, saw the necessity of a protecting levee being thrown up without delay, and the two proprietors had that matter under consideration. The judge who tried this case says in his written reasons for judgment; — “ On the first of May three interviews between plaintiff and the defendant were had on the subject of building such protecting levee between their two places on the side of the canal towards Mail-hot. Propositions between them were made at one time, an agreement accepted, then rejected, and eventually nothing was done towards building the projected levees.
“ These several interviews, and the conversation which took place *1361 thereat, and which is fully set forth by the testimony, will not lead me to believe other than that Mr. Mailhot was well aware of such a protecting levee as was spoken of and contemplated, being required as a means of defense to protect his plantation and cane from inundation by the crevasse water of the Mississippi, and to make it evident that Mr. Mailhot, at the time, could not 'have had any idea or belief that Mr. Pugh, by reason of his levee, dam or otherwise, intended to protect him, Mailhot, from inundation by crevasse water.”
Further on, in relation to the same matter, the judge proceeds;—
“ Plaintiff says it was impossible for him to put up a levee in time, because Pugh positively refused to enter into the agreement. From the testimony I do not understand that Mr. Pugh refused to enter into an agreement with Mailhot. On the contrary, defendant sought plaintiff, and expressed a desire to make an agreement with him for the erection of a proposed levee.
“Mr. Mailhot knew of the crevasses; knew that-the water was coming; was aware that his levee was bad and weak, in fact in almost a worthless condition, and yet, after being advised by his overseer to build a stronger and more perfect levee on his side towards Pugh, to the building of which Pugh had consented and offered to assist him, he refused to do any thing; waits idly during the time. Turjeon says a levee sufficient to protect Mailhot could have been built, at a cost of about fifty dollars, and finally quietly «subsides to the seepage and inundation, merely remarking to Mr. Pugh, “ if I am inundated, I shall hold you responsible for what damage I may sustaiD.”
The defendant, testifying, says his whole object was to protect a part of his crop from the imminent inundation, and that he was desirous of preventing any pretext for complaint, and therefore offered to assist the plaintiff in building a levee between certain designated points, provided a written agreement was made, exhibiting the stipulations and intentions of both parties, so as to prevent any misunderstanding, or pretense of legal obligation arising from effectuating those intentions. This was declined by plaintiff. Turjeon says that at one of the interviews between the plaintiff and the defendant, it was understood that the defendant was to work the pump, which working plaintiff alleges was one of the causes of his losses, and that the defendant also avowed his purpose to remove the dam, which subsequent removal was another cause of the inundation of plaintiff’s land. This last statement was objected to, and a bill reserved to its rejection, which we think well taken, and not necessary to discuss.
An examination of the testimony satisfies us that the plaintiff had in his power his own protection, by a timely adhesion to the system of common defence promptly adopted by his more energetic neighbour, *1362 which, if jointly executed with vigour, would have saved both from the devastating floods, which were sweeping on too fast to permit delay. The defendant, failing to obtain the co-operation of the plaintiff, proceeded to execute his own plan by the erection of levees upon his own property, and the construction of works thereon. These caused the damage to the plaintiff, as he alleges, and became the occasion of this suit.
It is disputed by the defendant that the works, erected by him, caused the damage. He charges that the seepage water was sufficient to have produced disaster to the plaintiffs crops, but it will be conclusive of the litigation, if we consider the matter in the light most favorable to the plaintiff, and as if the constructions of defendant had caused the damage.
The jurisconsults and tribunals of France have considered the questions presented in this case, not merely as abstract propositions, or naked principles, but in their practical application to actual events, and the consequences produced by them. France, like our State is traversed by rivers, whose banks are often unable to contain the swollen volume of water pent up between them, and give way under the pressure, or are submerged by the rising flood, until large tracts of country suffer from the inundation.
In Dalbon contre Graveson, it was held that — le propriátaire inférieur a le droit de construiré des digues ou autres ouvrages pour se garantir de ces inondations, lors méme qu’il aggraverait par la les dommages qu’elles peuvent causer aux propriótaires supórieurs. The Court delivering its reasons, or opinion, explain that the principles governing such cases are different from those regulating natural servitudes — que les ouvrages pour se garantir dans Tintórieur de sa propriáté des dóbordements d’un fleuve ou d’un torrent sont régis par d’autres principes que ceux sur les servitudes naturelles — and proceed to declare, Que chacun peut se préserver dans sa propriáté des dóbordements d’un fleuve lors méme que les ouvrages faits pour s’en garantir porteraient prejudice au voisin. * * * qu’en effet il en est du dóbordement des riviéres córame des incursions del’ennemi, dont chacun peut, par le droit naturel, songer a se garantir, sans s’occuper du sort de son voisin, qui n’aurait pas la méme prévoyance. Journal clu Palais, 1813, p. 384. '-And this was re-affirmed later. Duvernoy contre Sampso, Idem, 1861, p. 888.
The syllabus of these two cases is almost in the language of LaTaure when treating of this subject: le propriétaire infárieur a le droit de construiré des digues pour se préserver de l’inondation du torrent ou du fleuve qui borde son héritage encore ses digues fassent refluer Ies eaux d’une maniere prójudicable aux voisins. Edition 1827, p. 655.
Chardon, treating of the obligations of the proprietor, says ; — Tons *1363 les ouvrages qu’ils jugent propos a garantir leurs propriótés des desastres d’un débordement, soit en élevant leurs terrains jusqu’au bord du de la rive, soit par des digues, des chaussées, ou des murs construit sur leur propre sol et hors du lit du cours d’eau, peuvent étre executés á leur gré. * * * Il est cependant certain qu’il ne peut ainsi refuser le passage aux grandes eaux qu’en les repoussant ailleurs, et par la ex-posant les autres riverains a supportós les desastres qu’il redoute pour ■■ses héritages, nóanmoins, il use d’un droit légitime, il est d’autant moins responsable des consequences que les riverains peuvent, par de semblables travaux, les óviter; que, s’ils ne le font pas, ils devront s’en prendre, non a ce propriótaire vigilant, ruáis a leur indolence. Droit 'd’Alluvion, 345.
So Demolombe, reiterating what had been taught by his predecessors with striking unanimity, that a proprietor has a right to protect himself from damage by an overflow by the erection of works on his ■own land, even though they should cause the overflow to be more hurtful to his neighbor, continues; — Et lors máme que l’effet de ces travaux, plantations, digues, ou autres, serait, comme il arrive presque toujours, de rendre les eaux plus hostile etplus dommagéablesur autres fonds, les proprietaries de ceux-ci ne seraient pas fondós a se plaindre; car chacun peut en faire autant de son coté ; ce droit de preservation et de légitime défense est reciproque ; il était impossible que la loi imposát aux propriétaires riverains des fleuves et des rivieres l’obligation de laisser dévorer leurs fonds sans pouvoir rien faire pour les garantir. * * * Ces principes, si conformes a la raison et á l’équité, ont óté de tous temps reconnus, soit en droit romain, soit dans notre ancienne jurisprudence frangaise; et ils sont encore aujourd’hui consacrés par l’accord unánime des arrets et des auteurs, tome 11, No. 30.
To the plaintiff’s demand, the defendant opposes these legal principles which we think protect him from liability for any damage that may have been occasioned by the works erected by him on his own land for his own protection. But he goes further, and maintains that the plaintiff’s injury from the overflow occurred, irrespective of any act done by him, the defendant. Turjeon, who speaks intelligently, was on the spot all the time, and was the plaintiff’s overseer at the time, says, the water was in the plaintiff’s field before the pump began to work, or the dam was removed. This was the seepage water, which got into the plaintiff’s field because his levee was bad, as this witness testifies, and besides, the water was passing into the defendant’s field before the dam was. •cut. He says distinctly, in his belief, the dam would have been washed away any how, and we (Mailhot’s place) would have been inundated, and that if there had not been any levee at all made on Pugh’s plantation, the Mailhot place would have been drowned out' much faster.
*1364 The defendant explained to the plaintiff his whole plan of defenceagainst the back water as early as the first of May. He had formed the plan on 27th. April, and explained it to Mr. Rogers, his overseer, and directed him to set to work to execute it. It was done. The different levees were constructed, and the water that had collected inside-of them was drained or forced out by means of the pump, upon the-abandoned land outside of his levees. But before the completion of these works, or rather at the very commencement of them, Rogers, finding that the waters were backing up the canal or ditch, which ran parallel with the division line between the two places, but is cut wholly on Pugh’s land, without orders, put up a small dam on the canal. This dam was fifteen or eighteen inches above the water, and was not. intended to be permanent. During its construction, work was hurrying' on the levees. The canal was an open drain for the Pugh plantation, and at the time the dam was placed in it, was the only ditch of that plantation open to the rear. The dam remained until the 12th. of May, when the pump having been erected, and the levees of defendant completed, and the pump ready to start, defendant ordered Mr. Rogers to cut the dam. This was done. At the time of the cutting, under the testimony, it appears the water was running over it twelve or fourteen inches, and had been so running for eight or ten days. The dam cut, defendant’s pump started and drained water from the inside of his levees out, and on to the surface of his abandoned land.
The cutting of this dam, and the continued working of the pump, plaintiff alleges, was the direct and immediate cause of the inundation of his land, and the damage to his crops. The waters commenced to-rise on April 27th., and commenced to fall on May 22d.
It seems certain that if the dam had not been cut on the 12th., it must have given way under the pressure of the constantly swelling volume of water, but if it could be indubitably established that it would not have given way, plaintiff had a right to cut it. • Its temporary location in the canal was intended only to serve a transient purpose, viz to hold the waters in check until the system of connected levees should be completed. Surely the defendant was not bound by any principle of' law or ethics, to sit with folded hands, and see his property engulfed iby the floods that were spreading like a sea all around him, because the plaintiff did not choose to join with him in a plan of common defence, or did not choose to protect himself by works of his own.
The Code rises into the domain of morals, and stamps an ethical .principle with legal sanction, when it declares, that every act whatever of man, that causes. damage to another, obliges him to repair it by whose fault it happened. But the act which one has a right to do, and which an imminent peril requires him to do, to avoid a disaster that is *1365 Lurrying towards him, is not a fault. And if it were, he who has by his fault contributed to that of the other — who has by obstinacy or bad judgment, or negligence, or indolence, himself been the author of his -own misfortunes, and through these or like causes, has contributed to produce the condition of which he complains — cannot invoke in his behalf, and for his indemnification, an equitable principle which was intended to apply only for the benefit of those who are without fault in 'the particular matters that form the subject of complaint.
The judgment of the lower court is affirmed.
Rehearing is refused.